IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


ELMER BOUCHARD,                          )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )        2:20cv1490
                                         )        **Electronic Filing**
EASTMAN CHEMICAL RESINS, INC.            )
                                         )
            Defendant.                   )


## OPINION

Plaintiff commenced this employment action seeking redress for alleged discrimination in violation of the Age Discrimination Employment Act.  Presently before the court is defendant's motion for summary judgment.  For the reasons set forth below, the motion will be denied.

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(A).  Rule 56 "'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  Deciding a summary judgment motion requires the court to view the facts, draw all reasonable inferences and resolve all doubts in favor of the nonmoving party.  Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record

evidence to support the opponent's claim.  Nat'l State Bank v. Fed. Reserve Bank of New York, 979 F.2d 1579, 1581-82 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial*," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(E)) (emphasis in Matsushita).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" . . . "and cannot simply reassert factually unsupported allegations."  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs."  Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992); Sec. & Exch. Comm'n v. Bonastia, 614 F.2d 908, 914 (3d Cir. 1980) ("[L]egal conclusions, unsupported by documentation of specific facts, are insufficient to create issues of material fact that would preclude summary judgment."). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion.  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990).  If the non-moving party's evidence is merely colorable or lacks sufficient probative force summary judgment may be granted.  Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) (although the court is not permitted to weigh facts or

competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiff establishes the background set forth below. Plaintiff was born on August 17, 1956. He began working at Hercules Chemical, a chemical resins plant, as a general laborer in 1985. He remained employed by Hercules Chemical until Eastman Chemical ("defendant") acquired Hercules' Jefferson, Pennsylvania plant in 2001. At the time of Hercules' acquisition, plaintiff held the position of plant maintenance supervisor. Plaintiff did not immediately begin employment with Eastman Chemical. He applied to and interviewed with Eastman. Eastman subsequently hired him. In total, plaintiff worked for Hercules and Eastman for approximately thirty years.

In the course of those thirty years, plaintiff never received a disciplinary citation and consistently received positive performance evaluations. In performance reviews, Eastman supervisors lauded plaintiff for his leadership, decision-making ability, and responsibility. While plaintiff received many positive remarks, he reported fielding questions about his age and retirement plans. The first reported instance occurred sometime around 2011 or 2012. Plaintiff's former supervisor, Pete Huwe, inquired about when plaintiff intended to retire. Huwe raised the subject several times. Huwe did this in plaintiff's office and when the two would cross paths. Huwe also asked other older employees about their retirement plans.

Additionally, plaintiff fielded questions about his retirement plans from several management-level supervisors. One of these being the plant manager, Jerry Kuhn around 2012 or 2013. Kuhn remarked to plaintiff, "boy, you're looking pretty old; how old are you now; when do you plan to retire; [and] [a]re you going to retire soon." These comments were not made in a lighthearted or playful manner.

3

In or around 2013, Angela DeNucci began working at Eastman in an assistant role with human resources.  She invited plaintiff to her office to get to know him.  She asked him various questions about himself, including when he planned to retire.  Lastly, in 2014, plaintiff received inquiries into his retirement plans from his supervisor, Chuck Oldenburg.  Oldenburg asked plaintiff about his plans to retire roughly six or seven times.

Over the years plaintiff's diligence at work ostensibly led to his gradual promotions.  Beginning in approximately 1987, plaintiff received a promotion to assistant shift supervisor.  Roughly seven years later, he received a promotion to area shift supervisor.  Plaintiff then received a promotion to C5 maintenance area supervisor in 1994.  Two to three years later, he received a promotion to plant maintenance supervisor.  In 2012, plaintiff received a promotion to his final position, assistant area supervisor Sanyo, Solutions Poly.  He was 56 years of age at this time.  In this role, plaintiff was responsible for four to eight employees who directly reported to him.

These employees were called solution poly operators and solution poly helpers.  They ensured the plants operated in a safe manner and within environmental permit conditions.  Their daily tasks included inspecting whether any tanks, piping, pumps, valves, or equipment were leaking.  After completing their daily inspections, the operators drafted and initialed daily reports called "SPCC Sheet[s]."[1]  The SPCC sheet asked the operators a series of yes or no questions about the daily inspection pertaining to containers, tanks, pipes, piping, pumps, valves, and equipment leaks.

---

[1] SPCC stands for Spill Prevention, Control and Countermeasure.  Additionally included in the weekly reports were RCRA and CERCLA sheets.  RCRA stands for Resource Conservation and Recovery Act.  CERCLA stands for Comprehensive Environmental Response, Compensation, and Liability Act.

4

As assistant area supervisor, plaintiff received the SPCC sheets on a weekly basis. Plaintiff reviewed the reports to confirm their accuracy and completeness and then would submit them to Eastman's environmental department. These steps were followed to ensure Eastman was in compliance with regulations promulgated by the United States Environmental Protection Agency.

In September of 2014, plaintiff met with the head of Eastman's environmental department, Iliana Kratocvhil. Kratocvhil noticed plaintiff had delivered an incomplete SPCC sheet. In her presence, plaintiff completed the sheet. This prompted a discussion between the two regarding the operators' duties. Kratocvhil touched upon the operators' duty to complete SPCC sheets. Upon completion of the sheets, the operators were to log the information in defendant's internal computer system referred to as "PI."[2] Thus, defendant maintained an online and nearly contemporaneous record of the operators' daily reports. Kratocvhil memorialized the discussion on a "post-it."

On November 2, 2014, plaintiff discovered the absence of his unit's SPCC sheet for that week. Plaintiff repeatedly asked the responsible party, Shawn Pinkston, to either locate the missing sheet or draft a replacement. Exasperated by Pinkston's apathy, plaintiff approached his supervisor for a solution. Oldenburg assured plaintiff the sheet would be found and dismissed plaintiff to attend a meeting.

With the sheet still missing, plaintiff again approached Oldenburg for a solution. Oldenburg told plaintiff to draft a new SPCC sheet and affix Pinkston's initials. Plaintiff subsequently drafted a replacement SPCC sheet in Oldenburg's presence and initialed "SP" for Shawn

---

[2] Defendant refers to its internal computer records colloquially as "PI."

Pinkston. Oldenburg assured plaintiff that he was merely putting Pinkston's initials on the sheet to denote that Pinkston had been the reviewing operator. Plaintiff then signed his own name to affirm he had reviewed the sheet and handed it back to Oldenburg.

Approximately one week later, Kratocvhil met with Oldenburg concerning the SPCC sheet submitted on November 5, 2014. Kratocvhil informed Oldenburg of her disapproval regarding the initials. Oldenburg approached plaintiff and informed him of Kratocvhil's concern. He chastised plaintiff for using the same pen in affixing the initial's and plaintiff's signature. Oldenburg told plaintiff he should have used a different pencil so it would not appear that plaintiff filled in Pinkston's initials. Eastman subsequently opened an investigation concerning the SPCC sheet.

The investigation commenced on November 14, 2014, and consisted of four meetings between plaintiff and Eastman employees. First, plaintiff met with an upper-level employee of Eastman's human resources department, BJ Guinn. Plaintiff informed Guinn that he had signed Pinkston's initials on the SPCC sheet dated November 3, 2014. At this time, plaintiff produced the since-located original November 2, 2014, SPCC sheet. Plaintiff then accepted an opportunity to prepare a written statement. In his statement, plaintiff affirmed he initially could not locate the November 2 SPCC sheet and submitted a replacement sheet to the environmental department. Guinn then abruptly adjourned the meeting, telling plaintiff he had another meeting to attend.

Guinn quickly returned for a second meeting and resumed asking plaintiff questions about the duplicate November 3 sheet. Plaintiff responded that he had filled in Pinkston's initials simply because the sheets needed to be submitted. Plaintiff, Kuhn, DeNucci, and Chuck Oldenburg attended the third meeting. In this meeting, Guinn showed the attendees the November 2, 2014, and November 3, 2014, SPCC sheets. Plaintiff answered their questions regarding his conduct and stated he had signed Pinkston's initials on the sheets. Although being

6

in a meeting with Oldenburg, plaintiff did not inform the other attendees that Oldenburg had advised plaintiff to sign Pinkston's initials.

After, plaintiff and Guinn returned to Guinn's office for the fourth and final meeting. At this time, Guinn informed plaintiff that the matter was serious because plaintiff had forged Pinkston's initials. Guinn advised that he, plaintiff, and potentially others would have further discussions before Eastman reached a decision on the matter. Here, for the first time, plaintiff informed Guinn that Oldenburg had advised plaintiff to sign Pinkston's initials.

Eastman did not meet with plaintiff again regarding the matter. On November 19, 2014, Eastman terminated plaintiff for falsification of a company document. The decision to terminate was unanimous. Plaintiff was 58 years of age.

Plaintiff advances a claim of discrimination on the basis of age under ADEA. In order to prevail on a claim of intentional age discrimination, a plaintiff must prove that his or her age actually motivated or had a determinative influence in the adverse employment action in question. Fasold v. Justice, 409 F.3d 178, 184 (3d Cir. 2005) (citations omitted). Absent direct evidence of discrimination, claims brought under the ADEA are analyzed pursuant to the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Id.

Under the McDonnell Douglas framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. 411 U.S. at 802. See also Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013). If a plaintiff successfully establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its decision. McDonnell Douglas, 411 U.S. at 802; Burton, 707 F.3d at 426. If the defendant satisfies this "relatively light" burden, the burden shifts back to the plaintiff to show that the employer's stated reason was merely a pretext for intentional discrimination. McDonnell Douglas, 411 U.S. at 802, Burton, 707 F.3d at 426.

In order to establish a *prima facie* case of discrimination, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for the position that he held; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that give rise to an inference of unlawful discrimination.  Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 1999); see also Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003).  The burden to establish a *prima facie* case is not an onerous one, and a *prima facie* case can permit a court "to eliminate the most obvious, lawful reasons for the defendant's actions."  Pivirott v. Innovatibe Sys., Inc., 191 F.3d 344, 352 (3d Cir. 1999).

Here, plaintiff successfully establishes all four elements of a *prima facie* case of age discrimination.  First, he is a member of a protected class because he was 58 years old when terminated.  Second, defendant does not dispute that plaintiff was qualified for his position.  Third, plaintiff's termination constituted an adverse employment action.

Defendant asserts that plaintiff cannot establish the fourth element of a *prima facie* case of discrimination because defendant justifiably terminated plaintiff for forging a federally mandated document.  In support, it presents evidence that its employees twice counseled plaintiff and gave him written notice on the importance of timely and accurate SPCC sheet filings.  Further, defendant refers to its company policy as evidentiary support that plaintiff received ample training on the illegality of forgery.  Finally, defendant maintains that because the documents are federally mandated, forgery is an utmost afront to the integrity of the company and cannot be tolerated.

In response, plaintiff maintains he sufficiently establishes all four elements and defendant treated other employees outside the protected class more favorably.  As evidence, he produces examples of younger employees who received progressive discipline for similar infractions.  Defendant assertedly mischaracterizes the interactions between plaintiff and Kratocvhil as

8

meetings. Further, defendant purportedly relies on inconsistencies in its recounting of the alleged timeline of incidents. Plaintiff highlights several instances where supervisors and HR personnel inquired into his retirement plans. And finally, plaintiff notes that he was replaced by a younger worker following his termination.

Generally, a plaintiff may satisfy the fourth prong of a *prima facie* case by demonstrating that the circumstances surrounding the employment action in dispute substantiate an inference of discrimination, such as an instance where similarly situated individuals outside the protected class were treated more favorably. See Swierkiewicz V. Sorema N.A., 534 U.S. 506, 510 (2002): see also Sheridan v. E. I. DuPont de Nemours & Co., 100 F.3d 1061, 1066 n.5 (3d Cir. 1996) (en banc), cert. denied, 521 U.S. 1129 (1997) (discussing nature and purpose of *prima facie* case). The central focus of the inquiry is always whether the employee is being treated less favorably because of a protected trait. Pivirotto, 191 F.3d at 352 (quoting International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977)). The plaintiff must ultimately produce "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." Id. at 335 (quoting O'Connor v. Consolidated Coin Caterer's Corp., 517 U.S. 308, 312 (1996)).

Generally, controlling precedent for the fourth element of a *prima facie* case in a wrongful termination case recognizes that proof the defendant replaced the plaintiff with an individual outside the protected class, such as a member of the opposite gender or a younger coworker, satisfies the burden. The United States Court of Appeals for the Third Circuit sitting *en banc* in Sheridan so held and we are not at liberty to choose to ignore the import of such precedent. See Sheridan, 100 F.3d at 1066 n.5; accord Torre v. Casio, Inc., 42 F.3d 825, 830–31 (3d Cir. 1994) (observing historical development of circuit precedent on fourth element of *prima facie* case and the contextual approach that consistently has been employed). Consequently,

9

because defendant replaced plaintiff with a coworker approximately 36 years of age, plaintiff has carried the minimal burden to establish a *prima facie* case.

The second step of the McDonnell Douglas paradigm shifts the burden to the defendant to produce a legitimate, nondiscriminatory reason for the challenged employment action.  At this juncture, the defendant's burden is one of production, not persuasion, and the court's consideration of it "can involve no credibility assessment."  St. Mary's Honor Center, 509 U.S. at 509.  If the defendant meets this burden, the presumption of discrimination created by the *prima facie* case "drops" from the case.  St. Mary's Honor Center, 509 U.S. at 511; Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000).

Defendant has met this burden.  Defendant avers it terminated plaintiff for falsifying an SPCC sheet.  Defendant emphasizes that its EPA obligations to record the sheets accurately lends additional credence to its articulated reason for termination.  In other words, defendant meets its burden because it offers evidence that plaintiff received two prior counselings and written notice on the importance of timely and accurate SPCC sheets.  Further, plaintiff's extensive experience, previous trainings, and role as a manager lend support to the assertion that plaintiff should have known of the serious nature of such a violation.

Taking this evidence as true and without making any credibility determinations, the proffered evidence permits the conclusion that defendant possessed a nondiscriminatory reason for plaintiff's termination.  Therefore, defendant has satisfied its "relatively light" burden of production.  See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

Once the employer has satisfied its burden of articulating a legitimate reason for its adverse employment action, the burden of production shifts back to the plaintiff to show that defendant's proffered explanation was pretextual.  The United States Court of Appeals for the

10

Third Circuit has summarized the plaintiff's burden at summary judgment as to the third step of

the McDonnell Douglas tripartite analysis as follows:

> Specifically, in Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994), and later in Sheridan [E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996) (en banc)], we stated that a plaintiff may defeat a motion for summary judgment (or judgment as a matter of law) by pointing "to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer action." Fuentes, 32 F.3d at 764; Sheridan, 100 F.3d at 1067.

Jones v. School District of Philadelphia, 198 F.3d 403, 412–413 (3d Cir. 1999).

Under the first approach, the finder of fact's rejection of the defendant's proffered

explanation allows, but does not compel, a finding of discrimination and judgment for the

plaintiff.  Sheridan, 100 F.3d at 1061; Reeves v. Sanderson Plumbing Products, Inc., 530 U.S.

133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the

falsity of the explanation that the employer is dissembling to cover up a discriminatory

purpose.").  In other words, once a defendant's justification has been discredited, a jury is entitled

to infer that discrimination is the most likely alternative explanation, particularly because the

defendant is in the best position to explain the actual reason for its decision.  Reeves, 530 U.S. at

147.  "Thus, a plaintiff's *prima facie* case, combined with sufficient evidence to find that the

employer's asserted justification is false, may permit the trier of fact to conclude that the

employer unlawfully discriminated."  Id. at 148; Sheridan, 100 F.3d at 1061 (same).

"To discredit the employer's proffered reason. . . the plaintiff cannot simply show that the

employer's decision was wrong or mistaken, since the factual dispute at issue is whether

discriminatory animus motivated the employer, not whether the employer is wise, shrewd,

prudent, or competent."  Fuentes, 32 F.3d at 765.  Instead, the plaintiff must come forward with

evidence that demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its actions that a reasonable

11

factfinder <u>could</u> rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." <u>Id</u>. (citations omitted).  In meeting this burden the plaintiff need not cast doubt on every explanation advanced by the defendant, but rather is only required to present sufficient evidence from which a factfinder reasonably could infer that each of the employer's proffered non-discriminatory reasons is unworthy of credence. <u>Id</u>.

A plaintiff may also survive a summary judgment at the third state of the <u>McDonnell Douglas</u> analysis by identifying evidence which would permit the finder of fact to infer that invidious discrimination was more likely than not a motivating or determinative cause of the adverse employment action.  "For example, the plaintiff may show that the employer has previously discriminated against [the plaintiff], or that the employer has previously discriminated against other persons within the plaintiff's protected class, or that the employer has treated more favorably similarly situated persons not within the protected class."  <u>Simpson v. Kay Jewelers</u>, 142 F.3d 369, 645 (3d Cir. 1998).  In making this demonstration, the plaintiff "cannot selectively choose a comparator" amid a sea of employees who are otherwise treated equally with the plaintiff, but instead must point to evidence that is probative of unequal treatment motivated by discriminatory animus."  <u>Id</u>. at 645–647.

In conducting the <u>McDonnell Douglas</u> tripartite analysis, the court is not to view each piece of evidence independently, but instead must examine the record in its entirety and view it "as a whole picture."  <u>Abramson v. William Patterson College of New Jersey</u>, 260 F.3d 265, 276 (3d Cir. 2001) (citing <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 921 (3d Cir. 1997)).  In other words, at summary judgment, the court cannot "consider the record solely in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence,' because a jury

12

would be able to view the evidence as a whole. Consequently, the court must likewise do so and read the entire record in the light most favorable to the plaintiff.

Defendant maintains it terminated plaintiff solely for forgery and falsification of a company document. In support, it asserts that a combination of circumstances absolved it of any asserted obligation it had to institute progressive discipline. It twice counseled plaintiff on the importance of the timely and accurate submission of SPCC sheets and provided him with written notice on the importance of doing so. Defendant further insinuates that plaintiff's many years of company training impressed upon him a heightened awareness that his actions were deleterious. So from defendant's perspective, unlike younger employees, plaintiff should have known forgery was a terminable offense.

Notwithstanding defendant's insistence that its explanation is unassailable, when the record is viewed as a whole and without making credibility assessments, plaintiff has proffered sufficient evidence to permit the finder of fact to conclude that defendant's articulated reasons were not its true reasons; but instead were a pretext for discrimination. There are several instances in the record where a trier of fact may discredit defendant's articulated reasons. Plaintiff's proffering of evidence sufficient to discredit defendant's explanation coupled with the inferences that may be drawn from plaintiff's *prima facie* case will permit the finder of fact to conclude that the protected trait "actually played a role in [the employer's decision making] process and had a determinative influence on the outcome." Hazen Paper Co. v. Biggins, 50 U.S. 604, 610 (1993).

Defendant argues that plaintiff fails to substantiate an inference of discrimination because his conduct warranted termination. This argument is unavailing for several reasons.

First, the record permits a finding that defendant responded to forgeries and falsifications committed by younger employees with progressive discipline that fell short of termination.

13

Guinn testified that plaintiff's violation received extra gravitas because forgery of company documents was especially egregious. Yet, Guinn confirmed a twenty-eight-year-old received progressive discipline for "falsifying company records." Doc. No. 83-1 at 148. In that instance, the employee copied and pasted his supervisor's signature on "purchasing cards" and "reallocation forms." Id. Guinn agreed that the incident constituted forgery– essentially the same violation which allegedly justified plaintiff's immediate termination. The younger employee, however, received a "documented discussion" as punishment. Such a disparity in punishments for a substantially similar violation creates an inference that defendant's explanation for terminating plaintiff is pretextual. A reasonable jury may conclude as much.

Second, plaintiff has produced substantial evidence to create the impression that defendant never formally counseled or provided him with written notice on the importance of SPCC sheets. Defendant staunchly insists that it impressed upon plaintiff the severity of falsifying a company record during these counselings. But, a fact finder could view the first interaction between Kratocvhil and plaintiff as a meeting or instructional conversation, not a formal counseling.

Kratocvhil testified that plaintiff produced an incomplete SPCC sheet, prompting her to instruct him on the importance of accurately completing the sheets. Plaintiff then completed the sheet under her supervision and Kratocvhil accepted the sheet. Guinn corroborated this interaction. Guinn confirmed: "it may have been the one we talked about on [September 29, 2014] . . . the third event where he did not have it, couldn't find it, and then filled it out in front of her, that was the reason for the termination." Doc. No. 83-1 at 150. Guinn reiterated: "for a violation, falsification, forgery, however you want to put it, of that SPCC sheet the way he did, the way he went about doing in front of Ms. Kratocvhil, that's the reason why [he was terminated without progressive discipline]." Doc. No. 87-2 at 26.

14

The record confirms the interaction occurred in September of 2014. Both plaintiff and defendant agree that the SPCC sheet from the week of November 2, 2014, resulted in plaintiff's termination. The timelines are simply inconsistent as the employees responsible for terminating plaintiff cannot even confirm when plaintiff forged the document. Defendant's apparent disconnect and lack of awareness about the specific instance leading to plaintiff's termination create numerous issues of fact. This could lead a reasonable jury to doubt the veracity of defendant's articulated explanation.

With regard to the second counseling, Guinn stated he had no written record of the event. Rather, Guinn opined: "I don't have any documentation on the second time, it happened." Id. In other words, the only evidentiary support defendant can muster up is Guinn's belief that such a meeting occurred. It is entirely plausible that a reasonable jury may be unmoved by this dogged insistence. And viewing the entirety of evidence provided, a reasonable jury may determine that plaintiff never received counseling on the importance of generating timely and accurate SPCC sheet filings.

As to the post-it note, the record will permit a fact finder to conclude that defendant never gave plaintiff written notice. Defendant relies on the premise that plaintiff was sufficiently aware of the SPCC sheet's importance in justifying his immediate termination. It insists that the post-it note is proof of documented notice. But, both Guinn and Kratocvhil testified the written notice merely consisted of a brief recounting of the September 2014 meeting. The post-it note bore no further indicia of formal notice. A reasonable jury may infer that defendant lacked a documented history of communicating with plaintiff and attempted to develop one retroactively. Viewing the evidence in its entirety permits such an inference and provides yet another reason a fact finder could find defendant's articulated reason suspect.

15

Third, a jury could conclude defendant tacitly approved of plaintiff's actions and then deemed them inappropriate after it needed a reason to explain plaintiff's termination.  First, Kratocvhil accepted the SPCC sheet that plaintiff drafted in her presence in September of 2014.  Defendant took no immediate action and did not castigate plaintiff for what it later decried as an egregious infraction.  Second, plaintiff testified that his supervisor directed him to write Pinkston's initials on the sheet.  Oldenburg even quipped that he had done the same thing in the past.  This permits a jury to infer that writing another's initials on company documents was implicit and at times acceptable protocol, and that defendant only deemed it illegal after it made the decision to terminate plaintiff.

Fourth, the evidence will permit a reasonable jury to find that defendant inconsistently weighed an employee's training and experience in a way that disproportionately punished older employees.  Defendant presents plaintiff's training as evidence he knew or should have known that his actions had severe consequences.  And it is true plaintiff received company mandated training on its EPA-imposed reporting duties.  The record also indicates similarly situated employees who received the same training and committed similar infractions were not met with the same consequence, thus giving rise to an inference of a double standard.  This inference undercuts defendant's position that plaintiff received a harsher penalty due to his heightened knowledge of company protocol.

Fifth, a finder of fact could disagree with defendant's contention that plaintiff forged a document.  Plaintiff maintains that he never held out his initials on the sheet as those of Shawn Pinkston.  Instead, he wrote the initials to signify that Pinkston had conducted the daily inspection, and plaintiff signed the sheet to confirm he reviewed the information.  Further, Guinn agreed that plaintiff's actions were not definitionally forgery because the information on the sheet was verifiably correct.  Taken as a whole, a jury could plausibly conclude that plaintiff did not

16

forge the sheet because the initials were not duplicitous, and the information provided was accurate.

Sixth, a jury may view defendant's replacement of plaintiff with thirty-six-year-old Michael Roebuck as additional evidence discrediting defendant's proffered explanation. Defendant asserts it was contractually obligated to keep plaintiff's position filled.  Assuming that were true, a jury may still reason that defendant's conscious decision to replace plaintiff with a substantially younger employee supports an inference of an ulterior motive.  As such, the fact finder could view the circumstantial evidence as reflecting an intent to create a vacancy for Roebuck.

Seventh, a fact finder may reasonably infer that defendant's repeated inquiries into plaintiff's retirement plans circumstantially evinced a desire to facilitate plaintiff's departure from the company.  Plaintiff reported fielding questions about his retirement from several supervisors for several years leading up to his termination.  First, plaintiff's former supervisor questioned him in approximately 2011 or 2012.  The inquiries continued in 2012 or 2013 when the plant manager asked if plaintiff had plans to retire soon.  Kuhn remarked that plaintiff looked old.  Further still, Oldenburg and DeNucci, two persons involved in the forgery investigation, also badgered plaintiff about his retirement plans in 2013 and 2014.  A reasonable jury may well view such circumstantial evidence in concert with the foregoing and reasonably infer defendant possessed an ulterior motive in terminating plaintiff.

Viewing the record as a whole, reading the evidence in the light most favorable to plaintiff and after giving plaintiff the benefit of all reasonable inferences that may be drawn therefrom, it is clear that defendant is not entitled to summary judgment on plaintiff's age discrimination claims.  Consequently, defendant's motion for summary judgment will be denied

17

and the matter will be set for trial.

Date: August 7, 2026

                                        s/David Stewart Cercone
                                        David Stewart Cercone
                                        Senior United States District Judge

cc:     Jarrod Timothy Takah, Esquire
        Mary Chmura Conn, Esquire
        Paul A. Tershel, Esquire
        Sara M. Zeh, Esquire
        Jennifer G. Betts, Esquire
        Taylor E. Gillan, Esquire

        (*Via CM/ECF Electronic Mail)*